FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 1 3 2013

JAMES W. McCORMACK, CLERK
By: _____
                        DEP CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR )
FIRST SOUTHERN BANK, )
                          )
                Plaintiff, )
                          )
        v.                )
                          )
BKD, LLP,                 )
                          )
                Defendant. )
_____)

Case No. 4:13 cv 720 JLH

**JURY DEMANDED**

This case assigned to District Judge _Holmes_
and to Magistrate Judge _Kearney_

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation, as Receiver for First Southern Bank,

Batesville, Arkansas, files this Complaint against BKD, LLP ("BKD").

### INTRODUCTION

1.     On December 17, 2010, the Arkansas State Bank Department closed First

Southern Bank ("FSB" or the "Bank") and named the Federal Deposit Insurance Corporation as

Receiver ("FDIC").  FSB's closure was triggered by the discovery that all of the Bank's Property

Owner Improvement District Bonds ("Bonds") -- totaling $23.3 million -- that the Bank had

acquired through Arkansas attorney Kevin Lewis ("Lewis") were fraudulent.  The Bonds

represented approximately twelve percent (12%) of the Bank's total assets, and exceeded its total

equity capital of $19.3 million.

2.     At all relevant times during this fraud, BKD served as the Bank's external auditor.

3.     The FDIC, in its capacity as Receiver for FSB, alleges numerous acts and

omissions constituting professional negligence, gross negligence, and breach of contract by BKD

leading up to and in connection with its year-end 2009 audit engagement ("2009 Audit").  But

for its wrongful acts, BKD would have discovered Lewis's fraud and losses currently estimated to exceed $17 million would have been avoided. This lawsuit seeks to recover those losses.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff FDIC is a corporation and instrumentality of the United States of America, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C. 12 U.S.C. § 1821(d). Pursuant to 12 U.S.C. § 1821(c), the FDIC was appointed receiver of FSB on December 17, 2010, following the Bank's closure by the Arkansas State Bank Department. Pursuant to 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), the FDIC as Receiver for FSB, succeeded to all rights, titles, powers, privileges, and claims of FSB, and its stockholders, account holders and depositors, including, but not limited to, FSB's right to pursue claims against its former professional service providers, including those claims asserted herein against BKD. 12 U.S.C. § 1821(d)(2)(A)(i).

5.      Defendant BKD is a Missouri limited liability partnership headquartered in Springfield, Missouri with partners residing in several states, including Arkansas.

6.      This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 1819(b)(1) and (2) and 28 U.S.C. §§ 1331 and 1345. The FDIC has the power to sue in any court of law. 12 U.S.C. § 1819(a).

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## BACKGROUND

### History of First Southern Bank

8.     FSB was headquartered in Batesville, Arkansas and had a branch office in Searcy, Arkansas. FSB began operations on August 1, 2005, and offered consumer and business checking and savings accounts, online banking, debit card services, ATM, merchant banking services, and safe deposit boxes. It also offered a variety of mortgage, consumer, and business loans, consumer and business credit lines, and construction and development loans.

9.     Lewis began looking into acquiring the Bank in 2008, and by December 17, 2008, started attending Board of Directors meetings. On or about January 10, 2009, a Letter of Intent was signed for the PA Alliance Trust ("PAA Trust") to acquire majority ownership of FSB. Lewis formed the PAA Trust, with his parents as settlors for the benefit of his children.

10.     In March 2009, the Bank filed an Interagency Notice of Change in Control Application stating that the PAA Trust would acquire 53.77% of the total outstanding shares of FSB. On or about May 27, 2009, the PAA Trust acquired that interest by purchasing 71,200 shares of FSB stock from existing shareholders at $130 per share.

### FSB Becomes the Victim of a Fraudulent Scheme

11.     Prior to that time, beginning in December 2008, and continuing to September 2010, the Bank acquired twenty-three Bonds totaling $23.3 million through Lewis and his firm, the Lewis Firm, P.A. ("Lewis Firm"). The Bonds ostensibly were issued to complete infrastructure projects in nine counties in rural Arkansas. Lewis had represented issuers of improvement district bonds in the past and was known as an attorney who specialized in the placement of such bonds.

12.     All of the Bonds acquired by FSB were fraudulent and had no value. Lewis created the fraudulent Bonds using one of two methods. In some instances, he selected a legitimately formed improvement district that had previously issued valid bonds and prepared "bonds" dated years later in amounts larger than originally issued; Lewis would then pass those "bonds" off as legitimate bonds issued by that improvement district. In other instances, Lewis would prepare and file false improvement district formation documents and later file false documents reflecting the issuance of "bonds;" Lewis would also prepare the fictitious bonds and pass those "bonds" off as legitimate.

13.     FSB's first acquisition through Lewis was Hay Meadow Property Owner Improvement District No. 1 bond in the amount of $750,000, effective December 31, 2008. The acquisition was presented to FSB's Board of Directors as an investment, but the Board did not approve the acquisition at the time it was originally presented. Instead, the Board required that the Bond be underwritten and recorded in FSB's financial statements as a loan and also required that the Bank obtain an option to put the Bond back to the issuer. The Bank also required that the Lewis Firm act as a third-party guarantor obligated to repurchase the Bond if the issuer failed to honor the put option. The Lewis Firm provided a legal opinion in connection with the Bond stating that it had acted as counsel to the issuer since its creation and was familiar with its legal affairs. It was later discovered, after the fraud came to light, that the Hay Meadow Property Owner Improvement District did not exist.

14.     The Bank subsequently acquired 12 additional Bonds through Lewis during the period ending October 5, 2009, and recorded them as loans. These Bonds, including the Hay Meadow Bond, totaled $10.8 million. Beginning on December 16, 2009, and continuing through

4

September 29, 2010, the Bank acquired ten more Bonds through Lewis for a total of $12.5 million. The Bank recorded these ten additional Bonds as investments.

15.     Lewis and the Lewis Firm provided certain documentation and financial information with respect to some of the Bonds, and provided legal opinions relating to several of the Bonds.  In addition, for at least seven of the nine Bonds acquired prior to August 2009, the Bank's funds to acquire the Bonds were wire transferred to the Lewis Firm.

**BKD Learns of Lewis's Involvement with the Bonds**

16.     As noted, FSB recorded the first 13 Bonds as loans in its financial statements.  In April 2009, the FSB CEO and President sent an e-mail to the BKD relationship partner for FSB (who had previously served as BKD engagement partner for the FSB audits from inception of the Bank through 2008), and to the BKD engagement partner/manager for the FSB 2009 Audit, seeking advice as to whether the Bank should instead record the Bonds as investments.  BKD was told that the improvement districts had been formed by Lewis, who was also described as "the driving force" behind the recent change in control of the Bank. *i.e.*, the acquisition of majority ownership by the PAA Trust.  Based upon the representation (confirmed by Lewis) that the Bonds were all private placements, and the relationship partner's conclusion that the Bonds would "probably not qualify as investment grade," BKD agreed the Bonds should continue to be classified as loans, rather than investments.

17.     In June 2009, BKD conducted a loan review for FSB.  Although the Bonds were not subjected to the BKD loan review procedures, BKD noted in the course of the review that Bond files it had seen "had nominal documentation."

18.     Also in June 2009, BKD and FSB signed an engagement letter under which BKD was to conduct the 2009 Audit.  Beginning in November 2009, BKD planned and executed the

2009 Audit, culminating with a June 16, 2010, report to FSB which concluded that the Bank's "balance sheet . . . presents fairly, in all material respects, the financial position of First Southern Bank as of December 31, 2009, in conformity with" Generally Accepted Accounting Principles ("GAAP").

**The FDIC Discovers Lewis's Fraud**

19.    Just months later, in the Fall of 2010, in the course of a routine examination of FSB, FDIC examiners discovered the Bonds were fraudulent and worthless.  The Bonds were written off, causing FSB to become critically undercapitalized.  The Arkansas State Bank Department closed the Bank on December 17, 2010, and appointed FDIC as Receiver.

**BKD's Violations of Governing Auditing and Other Professional Standards**

20.    BKD served as FSB's external auditor from the Bank's inception in 2005, including completing the audit as of July 31, 2008.  In addition, FSB officers periodically consulted the BKD relationship partner for FSB to answer questions and provide accounting advice and/or services.  In light of this ongoing relationship, the expectation at the conclusion of the 2008 audit was that the engagement would continue for the 2009 Audit, which it in fact did.

21.    FSB relied upon the experience, skill, expertise, and greater knowledge of BKD in providing professional advice and services in the field of accounting and auditing throughout the FSB/BKD relationship, which relationship extended over several years beginning in 2005. FSB specifically relied upon BKD's superior knowledge, skill, and judgment in BKD's conduct of audits of FSB.

22.    In the engagement letter for the 2009 Audit, dated June 8, 2009, BKD made, among others, the following representations and promises to FSB:

- BKD would "audit the balance sheet of First Southern Bank as of December 31, 2009, in accordance with auditing standards generally accepted in the United States of America."

- "The objective of our audit is the expression of an opinion on the conformity of your financial statements, in all material respects, with accounting principles generally accepted in the United States of America."

- "Auditing standards generally accepted in the United States of America require that we plan and perform the audit to obtain reasonable . . . assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."

- "Our audit is designed to detect misstatements that, in our judgment, could have a material effect on the financial statements taken as a whole."

- "An audit also includes obtaining an understanding of the entity and its environment, including internal controls, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing and extent of further audit procedures to be performed."

- "We will inform you of" material weaknesses or significant deficiencies "that come to our attention."

- "We will inform you of" errors, misrepresentations, fraud or illegal acts "if material, that come to our attention."

23.    In its pre-audit report to FSB, sent by BKD in January of 2010, BKD reiterated its

promises, among others, as follows:

- "We will conduct our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation."

- "Our audit approach emphasizes the areas of higher risk, focusing on the unique characteristics of the operating environment, the effectiveness of your internal control and your financial statement amounts and disclosures."

- "Based on our understanding of your entity and our assessment of your internal control, we plan our audit to achieve the appropriate level of assurance regarding

material misstatements and material weaknesses in internal control over financial reporting."

- "[T]here may be instances that require communication during the audit (prior to delivery of the financial statements)," including "Illegal acts" and "Significant deficiencies and/or material weaknesses."

- "Loans" and "investments" were listed as "Critical Audit Areas."

24. Thus, BKD committed itself to, and was required to, perform its audit in compliance with the standard of care for its profession, including, but not limited to, Generally Accepted Auditing Standards ("GAAS"). For purposes of this Complaint, these standards will be referred to as GAAS and cited as AU. Among the auditing standards applicable to BKD's audit of FSB are:

- The auditor must have adequate technical training and proficiency to perform the audit.

- The auditor must exercise due professional care in the performance of the audit and the preparation of the report.

- The auditor must adequately plan the work and must properly supervise any assistants.

- The auditor must obtain a sufficient understanding of the entity being audited and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing and extent of further audit procedures.

- The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.

25. GAAS also requires the auditor to understand (i) the audit client, customer relationships, industry conditions, economic conditions, regulatory environment, relevant accounting pronouncements, and other external factors; and (ii) the internal controls over financial reporting the audit client has in place to determine whether they are designed properly.

8

26.     To comply with GAAS, the auditor must identify risks of material misstatement at appropriate levels of detail, and design appropriate auditing procedures to address such risks. Due professional care requires the auditor to exercise professional skepticism – *i.e.*, a questioning mind and a critical assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt.

27.     Under GAAS, the audit procedures designed by the auditor generally depend on the risk of material misstatement. The greater the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from tests of the effectiveness of internal controls and substantive audit procedures must be. The auditor must plan and perform the audit to obtain sufficient appropriate audit evidence to afford a reasonable basis for an opinion regarding the financial statements and to reduce to a low level the risk that the auditor will fail to detect a material misstatement. If the auditor is unable to obtain sufficient appropriate audit evidence, the auditor should express a qualified opinion or a disclaimer of opinion.

28.     In addition, GAAS requires the auditor to communicate about possible fraud to management and those charged with governance of the entity "whenever the auditor has determined that there is evidence that fraud may exist." AU 316.79.

29.     There were several points in time when BKD, based on its knowledge, experience, and expertise, had knowledge or information, or should have gained knowledge or information, evidencing fraud, at which point, the communication required by BKD under professional standards, if made as it should have been, would have stopped further Bond acquisitions and avoided the damages that arose from those acquisitions.

**BKD's Failures at the Time of Accepting the 2009 Audit Engagement**

30.     An audit firm such as BKD has a responsibility to adopt a system of quality control when conducting an audit practice. AU 161.02. While GAAS relates to the conduct of individual audit engagements, the American Institute of Certified Public Accountants ("AICPA") also has set forth quality control standards that relate to a firm's audit practice as a whole. AU 161.03. Quality control standards are referred to herein as "QC Standards" and cited as "QC."

31.     BKD was required to comply with QC Standards, including guidance pertaining to the acceptance and continuance of client relationships and specific engagements. QC Section 10 states that the audit firm "should establish policies and procedures for the acceptance and continuance of client relationships and specific engagements, designed to provide the firm with reasonable assurance that it will undertake or continue relationships and engagements only where the firm," *inter alia*, has considered "the integrity of the client," including "related parties," and is "competent to perform the engagement." QC 10.27. In addition, the firm "should obtain such information as it considers necessary in the circumstances before accepting an engagement with a new client, when deciding whether to continue an existing engagement, and when considering acceptance of a new engagement with an existing client." *Id.*

32.     Thus, QC Standards required BKD to consider the above information about FSB at the time it was deciding whether or not to accept the 2009 Audit engagement. FSB was recommended as a client and approved on June 9, 2009. At that time, BKD had been aware of, among other things, the acquisition of majority ownership of the Bank by the PAA Trust, that Lewis was "the driving force" behind that acquisition, and that Lewis was also involved in the Bond transactions. This and other information should have caused BKD to make further inquiry

into the PAA Trust and the change in control of the Bank, as well as the material related party

Bond transactions involving Lewis and the Lewis Firm.

33.     While it acknowledged its obligations under the QC Standards, BKD did not

consider the risks posed by the change in principal owners, related parties, or the other required

matters, and accepted the 2009 Audit engagement.  Had BKD considered and investigated these

risks prior to accepting the continuing engagement by making inquiry into the PAA Trust and the

related party Bond transactions, it would have discovered the "nominal documentation" of the

Bonds that other BKD personnel had discovered just a few weeks later during the BKD loan

review engagement.  BKD would then have been obligated to investigate further, and discovered

that the Bonds were a sham and fraudulent.  If BKD had complied with the QC Standards, FSB

would have avoided the acquisition of Bonds after June 9, 2009, and would not have suffered the

resulting damages.

**BKD's Failures During the Risk Assessment and Audit Planning Process**

34.     As described below, BKD violated professional standards in its planning of the

2009 Audit by, among other things, not giving adequate consideration to significant audit issues

and risks stemming from the Bond transactions and, in particular, the risk of fraud.  Had it

adequately assessed these risks, BKD would have implemented the necessary and appropriate

audit procedures and detected Lewis's fraud, avoiding millions of dollars in losses incurred by

the Bank.

BKD Failed to Assess the Elevated Risk of Fraud for the 2009 Audit.

35.     By the time of its planning for the 2009 Audit, BKD knew that (i) FSB had

acquired several million dollars worth of Bonds, an entirely new class of transactions for the

Bank; (ii) certain of the Bond files seen by BKD during its loan review engagement had only

11

"nominal documentation"; (iii) the PAA Trust had recently become the majority owner of FSB; (iv) Lewis was the "driving force" behind the PAA Trust's acquisition of its majority interest in FSB, his children were the beneficiaries of the PAA Trust, and his parents its settlors; and (v) Lewis and the Lewis Firm were also involved in the acquisition of the Bonds by the Bank. These facts constituted risk factors that should have been included in BKD's risk assessment for the 2009 Audit.

36.     Indeed, AU 316, Consideration of Fraud in a Financial Statement Audit, specifically identifies as fraud risk factors "significant, unusual or complex" transactions and "significant related party transactions outside the normal course of business." BKD failed to properly take these risks into account in its planning of the 2009 Audit, and as a result its audit planning was deficient, as described below.

> BKD Failed to Properly Supervise Its Audit Team, Assigning an
> Inadequately Trained and Inexperienced Auditor as the "In-Charge."

37.     BKD assigned an inadequately trained and inexperienced auditor as the In-Charge for the 2009 Audit, who had just graduated from college, and had no prior audit experience when he first began working for BKD in August 2008.  He had been with BKD for approximately one year when he began planning and working as the In-Charge on the 2009 Audit.  BKD considered the 2009 Audit of FSB to be a training tool for this In-Charge.  In fact, he planned the 2009 Audit alone in late 2009.

38.     As alleged more fully below, BKD's decision to assign an inadequately trained and inexperienced auditor as the In-Charge for the FSB audit was grossly negligent, particularly when this was compounded by BKD's failures to (i) provide the audit team with information, supervision, and oversight necessary to identify, properly evaluate, and respond to the heightened degree of audit risk associated with the 2009 Audit; (ii) properly supervise the audit

team's work and review the audit team's audit strategy and plan, including but not limited to,

improperly excluding the Bonds from relevant audit procedures; and (iii) ensure that BKD

obtained a sufficient understanding of the PAA Trust, as well as Lewis's relationship to the PAA

Trust, participation in FSB Board meetings, and involvement in the Bank's acquisitions of the

Bonds.

### BKD Failed to Identify the Significant Audit Risks Associated With the Bonds.

39.     For planning purposes, BKD used the Bank's June 30, 2009, Uniform Bank

Performance Report, in which the Bank classified the Bonds as loans.  The In-Charge was

unaware of the Bonds and the significant audit risks associated with them when he planned the

audit and designed BKD's audit strategy for the 2009 Audit.  In particular:

- BKD selected several Bond loan accounts from the Bank's November 23, 2009, Loan
  Trial Balance for confirmation.  Bonds totaling $10.7 million recorded in ten accounts
  in the Bank's commercial loan system at December 31, 2009, however, were
  excluded from year-end credit review and documentation audit procedures because
  the Bonds were re-classified by Bank management as investments as of December 31,
  2009.

- The In-Charge was not familiar with Arkansas property improvement district bonds
  generally, did not know what documents should be in a property improvement district
  bond file, and did not know whether credit quality, collectability, impairment, and fair
  value were issues relevant to non-investment grade improvement district bonds.

- The In-Charge did not know that in April 2009, BKD had concluded that the Bank
  was properly treating and administering the Bonds as loans, or that the relationship
  partner believed the Bonds would not be considered investment grade and, therefore,
  should be classified as loans in the Bank's balance sheet.

- While the In-Charge signed-off as having reviewed BKD's draft 2009 Loan Review
  Report, he did not consider in any way the finding in that Report that certain of the
  Bond files "had nominal documentation."

40.     In sum, in the planning of the 2009 Audit, BKD failed to identify the Bonds as a

new, material, complex, and difficult-to-value class of transactions that were non-marketable,

private placement, non-investment grade debt securities with risk characteristics more typical of

loans than investments. Given this structure of the Bonds, BKD should not have excluded them from its year-end credit review and loan file documentation audit procedures. These procedures were relevant to, and should have been performed to evaluate, the credit quality, sufficiency of documentation, potential impairment, and fair value of the Bonds. A properly trained, experienced, and reasonably proficient auditor would have subjected debt securities with loan risk characteristics selected for testing during its investment audit work, to BKD's loan audit procedures rather than excluding them from such audit procedures.

### BKD Failed to Consider the Audit Risks of the Change in Ownership of FSB.

41.     In addition, BKD's 2009 Audit Plan failed to address the risk of fraud posed by the 2009 change in control of a controlling interest in the Bank. In planning the 2009 Audit, BKD did not design audit procedures to adequately review and understand the PAA Trust's acquisition of FSB stock. At the time he planned the 2009 Audit, the In-Charge did not know who Lewis was and, on information and belief, was not aware that non-Board member Lewis regularly attended FSB Board meetings throughout 2009, even though Board meeting minutes that were reviewed by BKD identified Lewis as a participant in these meetings.

42.     While the In-Charge knew that the PAA Trust had acquired a controlling interest in FSB in 2009, he did not know who formed the PAA Trust or that Lewis was related to it in any way. At the time of the 2009 Audit, the In-Charge did not know who Lewis was, that Lewis was "the driving force" behind the PAA Trust's acquisition of a majority ownership interest in the Bank, or that Lewis and the Lewis Firm were involved in the Bank's acquisitions of the Bonds.

43.     During planning for the 2009 Audit, BKD identified the PAA Trust's acquisition in 2009 of a majority of FSB's stock as posing a risk of material misstatement due to error or fraud. There is no indication how, if at all, BKD addressed this specifically identified audit risk.

44.     BKD was required to document the nature of the relationship between the Bank and the PAA Trust, and the nature and extent of business conducted with the related entity. While BKD identified the PAA Trust as a related entity, its only description of the relationship was stockholder. BKD further identified the PAA Trust as a principal owner or controlling party, but failed to document the name of the related entity, address (locations) of the related entity, the nature of relationship, and nature and extent of business conducted with the related party. Had this information been obtained and properly considered by BKD, it would have raised serious concerns about Lewis' participation in FSB Board meetings and his involvement with the Bank's acquisitions of the Bonds. At a minimum, such concerns should have caused BKD to design and perform more robust audit procedures with respect to testing the Bonds.

BKD Failed to Address the Risk of Fraud Posed by the Related Party Bond Transactions.

45.     BKD's 2009 Audit Plan also failed to address the risk of fraud posed by the Bank's acquisitions of the Bonds through the related parties Lewis and the Lewis Firm. The BKD relationship partner had learned that Lewis was the "driving force" behind the transfer of the majority ownership of FSB. He did not, however, discuss this with the audit team, including the In-Charge before or during the audit planning. The relationship partner did not believe it was necessary for the In-Charge to know these facts, nor did he believe it necessary for the BKD auditors to obtain an understanding of the ownership structure of the PAA Trust when planning and conducting the 2009 Audit.

15

46.     Under professional standards, in obtaining an understanding of a client's business, the auditor should perform procedures to determine the existence of related party relationships and transactions with such parties. After identifying related party transactions, the auditor should perform procedures necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements being audited. Such procedures include obtaining an understanding of the business purpose of the transaction and examining executed copies of agreements, contracts, and other pertinent documents.

47.     As part of planning for the 2009 Audit, a questionnaire identified the PAA Trust as a related entity. Despite BKD's knowledge that Lewis was (i) "the driving force" behind the PAA Trust's acquisition of a majority ownership interest in FSB, and (ii) also involved in the Bank's acquisitions of the Bonds, BKD did not identify the Bonds as related party transactions for audit planning purposes. Thus, while the PAA Trust was identified as a related entity, BKD failed to obtain necessary information about it to identify and properly evaluate risks of material misstatement arising from FSB's transactions with related parties.

48.     Generally Accepted Accounting Principles ("GAAP") define a related party to include:

- affiliates of the institution (a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an institution);

- principal owners of the institution and members of their immediate families;

- management of the institution and members of their immediate families;

- other parties with which the institution may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and

- other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

49. The relationship between the PAA Trust, Lewis, the Lewis Firm, and the improvement districts that purportedly issued the Bonds (which were formed with the assistance of and represented by Lewis and the Lewis Firm), provided a sufficient nexus such that the Bonds represented related party transactions that BKD should have but failed to properly consider during the 2009 Audit. In particular, BKD did not identify FSB's acquisitions of the Bonds as related party transactions, even though BKD identified the PAA Trust as a related entity, and the PAA Trust met BKD's definition of a related party requiring BKD to consider the implications of organizational structures that appear to be designed to obscure related party transactions.

BKD Failed to Obtain an Understanding of FSB Internal Controls.

50. BKD also failed to obtain an understanding of FSB internal controls relating to the Bonds.

51. BKD's definition of "alternative investments" included "non-marketable securities" that were encompassed within FSB's "Investing and Financing" transaction cycle. Even though the Bonds were an entirely new type of transaction for FSB, and were classified and reported as investments in the FSB balance sheet at December 31, 2009, BKD failed to update the Bank's "Investing and Financing" transaction cycle, as required by GAAS, and perform a walkthrough to obtain an understanding of the Bond transactions and assess the audit risks relating to them.

52.     As a result, BKD failed to detect material weaknesses existing in the Bank's internal controls relating to the Bonds, including the documentation deficiencies noted during the BKD loan review engagement.

53.     BKD's 2009 Audit procedures designed to obtain an understanding of the client and its internal controls were performed in early November 2009. Had BKD obtained a proper understanding of FSB and its environment at the time it performed these procedures, BKD would have identified the material internal control weaknesses with respect to the Bonds and raised concerns with regard to their authenticity. This would have led to the discovery by BKD that the Bonds were a sham and fraudulent, and no further Bonds would have been acquired by the Bank.

**BKD's Failures During Execution of the 2009 Audit**

54.     BKD did not properly execute the 2009 Audit in accordance with professional standards in several respects. The objective of BKD's 2009 Audit was the expression of an opinion as to whether FSB's December 31, 2009, balance sheet presented fairly, in all material respects, the financial position of the Bank in accordance with GAAP. FSB's balance sheet contains management's assertions regarding the recognition, measurement, presentation, and disclosure of information with respect to account balances and classes of transactions. For each significant class of transactions, account balance, and presentation and disclosure, auditors use relevant assertions to identify and assess risks of material misstatement and to design effective audit procedures to address these risks and obtain sufficient appropriate audit evidence to support their opinion.

55.     Significant assertions relevant to the Bonds include those relating to their existence, classification, and valuation. In particular, BKD's role was to confirm both the existence and value of the Bonds (whether they were classified as loans or as investments in

FSB's accounting records).  To properly assess risks of material misstatement in FSB's balance sheet relating to the existence and valuation of the Bonds, whether due to error or fraud, BKD was required to obtain a sufficient understanding of FSB and its environment, including its internal controls and the existence of related party relationships.  As alleged above, its planning was negligent and failed to do so.

56.     BKD's negligent planning alleged above led it to employ deficient audit procedures.  BKD then performed these inadequate procedures in such a grossly deficient manner that BKD failed to obtain the sufficient appropriate audit evidence required by GAAS to confirm either the existence or the value of the Bonds.  Further, had proper procedures been performed, the fraudulent nature of the Bonds would have been detected.

> BKD Failed to Follow Up Adequately on the Lack of
> Responses to the Positive Confirmations for the Bonds.

57.     The audit procedures employed by BKD while the Bonds were classified as loans by FSB were insufficient to establish either their existence or value.

58.     Pursuant to its interim audit procedures, BKD selected Bond loan accounts from the Bank's November 23, 2009, Loan Trial Balance and mailed three positive loan confirmations and five negative loan confirmations in connection with audit procedures to test the existence of the Bonds.  These confirmation letters were prepared by Smiley Technologies, Inc. ("STI"), the Bank's data processor.  Bond "Account Details" statements prepared by STI show that the mailing addresses for all of the Bank's Bonds held at December 31, 2009, contained the same street, city, state and zip code – the same mailing address of the PAA Trust.

59.     On information and belief, the addresses for all eight BKD Bond loan confirmations contained the same street, city, state and zip code information.  BKD's practice was to not maintain control copies of negative confirmations; and while it was its practice to

retain copies of positive confirmations, it did not retain copies of the 2009 Audit positive loan confirmations in its work papers.

60.     Professional standards require auditors to exercise a heightened degree of professional skepticism when they become aware of concerns regarding a confirmation respondent's competence, knowledge, motivation, ability, or willingness to respond, or about the respondent's objectivity and freedom from bias with respect to the audited entity, including whether or not the respondent is a related party.  BKD's own audit procedures required it to review the confirmations prepared by STI, verify information on the confirmations to the Bank's records, and review the confirmations with an FSB officer.  Had BKD done so, it would have seen that the addresses on all eight Bond loan confirmations were the same, which would have raised serious concerns about the authenticity of the Bonds.

61.     BKD mailed positive loan confirmations on November 24, 2009, and second requests were mailed sometime after that date.  By February 12, 2010, BKD still had not received a reply to any of these Bond confirmations.  As part of its fieldwork, BKD was required to follow up on the lack of responses by performing alternative procedures to verify the existence and value of the Bonds.  BKD, however, noted that it performed alternative procedures by simply examining the original signed note or agreement and reviewing the account history, and that the accounts appeared reasonable.  There is no indication that BKD reviewed any other documentation in the Bond files.

62.     In addition, the account histories for two of the three Bonds (Rolling Meadows Property Owner Improvement District No. 1 and Emerald Hill Property Owner Improvement District No. 1, $1,280,000 and $2,000,000 respectively) would not have shown any payment activity because the first payment on each of these Bonds (as shown on the face of the Bond

certificate) was not even due until December 31, 2010. Consequently, the only thing BKD verified with these alternative procedures was the recording of the fraudulent Bonds in FSB's accounting records.

63.     The third "no confirmation reply" was for the Fieldstone Extended #2 Bond ($2,500,000), which BKD had initially selected but then excluded from its 2009 loan review procedures, and for which BKD noted there was only "nominal documentation."

64.     Professional standards require audit documentation in sufficient detail to provide a clear understanding of the work performed, the audit evidence obtained and its source, and the conclusions reached. Such documentation should enable an experienced auditor, having no previous connection to the audit, to understand (i) the nature, timing and extent of auditing procedures performed; (ii) the results of the audit procedures performed and evidence obtained; and (iii) the conclusions reached on significant matters. BKD's documentation of the alternative audit procedures intended to compensate for the lack of responses to the three positive confirmations failed to meet these requirements.

65.     Considering that even a cursory review of the Bond files would have raised concerns about the sufficiency of the documentation, it appears the BKD auditors did not review the files at all, or lacked the proficiency and technical training to understand the implications of the documentation deficiencies.

66.     Had a proper review of the Bond files been conducted, BKD would have determined that the Bonds were fraudulent, which it would have been required to report to FSB management. Had it done so, further acquisitions of Bonds would have been prevented.

BKD's Audit Procedures When the Bonds Were Re-Classified
as Investments At Year-End Were Also Inadequate and Negligently Performed.

67.     All of the Bonds that had been maintained on the Bank's loan system at

December 31, 2009 were re-classified by Bank management as investments in the FSB year-end

balance sheet, and on or about January 4, 2010, were removed from the loan system.  Thus,

during the 2009 Audit, BKD subjected the Bonds to the year-end audit procedures for securities

and investments.  The procedures BKD employed to audit the Bonds as investments, however,

were both inadequate and negligently performed.  Had BKD performed the required audit

procedures, it would have detected Lewis's fraud.

BKD Failed to Identify Documentation and Other Deficiencies of the Bonds.

68.     To verify their existence, BKD looked solely at the fraudulent Bonds themselves;

failed to note or follow-up on inconsistencies and anomalies on the face of the Bonds; examine

other documentation, if any, in the Bond files; or seek to supplement the "nominal

documentation" that would have been apparent from a review of the files.

BKD Failed to Hire an Expert to Value the Bonds.

69.     All of the Bank's investments, including the Bonds, were classified by

management as held-to-maturity.  During 2009, however, the Bank had sold some of its

investments, tainting its held-to-maturity investment portfolio and requiring that all investments,

including the Bonds, be re-classified as available-for-sale securities and recorded at fair value.

During audit planning, BKD did not consider the audit risks and significant implications to

FSB's year-end 2009 balance sheet of recording the Bonds at fair value.  As a result, BKD did

not hire a specialist to assist in assessing the Bonds' fair value, as it did for other securities held

by the Bank.

70.     FTN Financial held FSB's marketable securities (which did not include the Bonds) for safekeeping. BKD knew that FSB's management did not challenge the market values set by FTN Financial for these marketable securities, and identified this as a potential risk of material misstatement due to error or fraud. To address that identified risk, BKD used Harvest Investment, a third-party investment advisor, to verify the market prices of all twelve of the Bank's marketable securities totaling $13 million at year-end 2009.

71.     The Bonds, on the other hand, were kept for safekeeping by FSB in its vault and valued by Bank management. BKD, however, did not use the services of Harvest Investment or any other specialist to verify the fair value of the Bank's eleven non-marketable Bonds totaling $12.1 million at year-end 2009, even though circumstances called for the use of a specialist. Rather, BKD wrongly concluded that FSB's management analyzed the bonds for impairment much like a loan and estimated their fair value based on the present value of future cash flows.

72.     BKD did not test Bank management's purported present value calculations or the reasonableness of assumptions used in those calculations. Instead, BKD relied solely on debt service coverage ("DSC") ratios provided by FSB management to conclude that the Bonds were not impaired and, therefore, the book value of the Bonds, recorded at their historical amortized cost, was equal to their fair value. BKD, however, did nothing to test the DSC ratios by, for example, reviewing Bond trustee account statements or improvement district financial statements to verify and evaluate the reliability of the tax revenues that were to provide the cash flow necessary to service and retire the Bonds.

73.     Had BKD hired an expert to perform a proper valuation of the Bonds, that expert would have conducted the proper inquiry and determined that the Bonds were fraudulent. Alternatively, had BKD requested from FSB the documentation to verify the creditworthiness of

the borrowers issuing the Bonds in order to properly test management's DSC ratios, BKD would have uncovered the fraud. BKD would have had to report either finding to management, thus preventing any future Bond acquisitions and avoiding the damages that arose from those acquisitions.

**The Issuance and Withdrawal of the 2009 Audit Opinions**

74.   BKD issued its opinion on the year-end 2009 FSB financial statements in an audit report dated June 16, 2010, wherein BKD stated: "In our opinion, the balance sheet … presents fairly, in all material respects, the financial position of First Southern Bank as of December 31, 2009, in conformity with accounting principles generally accepted in the United States of America."

75.   By letter to the FSB Audit Committee, dated November 15, 2010, after the FDIC had begun to investigate Lewis's fraud, BKD withdrew its opinion on FSB's financial statements "due to the investigation that is currently being conducted on certain private placement bonds."

**CLAIMS FOR RELIEF**

**Count I**
Professional Negligence

76.   The FDIC incorporates paragraphs 1-75 into this claim for relief.

77.   BKD owed FSB, its client, a duty to perform its audit and professional services in accordance with applicable professional standards. As alleged more fully herein, BKD breached its duty in at least the following ways, among others:

    a.   failing at the time of accepting the 2009 engagement to consider information it knew at the time about the PAA Trust, the change in control of the Bank, the material related party transactions involving Lewis and the Bonds, and the "nominal documentation" of those Bonds, and thus failing to investigate those matters, in violation of QC Standards;

b. failing to properly supervise and assigning an inadequately trained and inexperienced auditor to be the In-Charge for the 2009 Audit, and compounding that error by failing to provide the audit team with necessary information and proper supervision, including failing to ensure a proper understanding of the circumstances surrounding the Bonds was obtained;

c. excluding Bonds from the year-end credit review and documentation audit procedures because the Bonds were classified as investments as of December 31, 2009, even though BKD had concluded that the Bonds should be classified as loans and were likely not "investment grade" securities;

d. in the planning of the 2009 Audit, failing to identify the Bonds as a new, material, complex and difficult-to-value class of transactions that were non-marketable, private placement, non-investment grade securities with risk characteristics more typical of loans than investments;

e. failing to consider the risks of the change in ownership of FSB in planning the 2009 Audit;

f. failing to consider the risks of fraud posed by the related party nature of the Bond transactions in planning the 2009 Audit, including failing to identify the Bond transactions as related party transactions, as GAAS clearly defined them to be;

g. in the preparation for and execution of the 2009 Audit, failing to hire an expert to provide a valuation of the Bonds during the 2009 Audit;

h. failing to adequately test FSB management's purported present value calculations as to the Bonds or the reasonableness of assumptions used in those calculations, including failing to review Bond trustee account statements or improvement district financial statements, and instead conducting an ineffective review of Bond account histories provided by FSB management and relying solely on DSC ratios provided by Bank management;

i. failing to adequately follow up on the lack of responses to positive confirmation requests;

j. failing to adequately follow up on the fact that all eight of the Bond confirmations were sent to the same address;

k. failing to properly confirm the existence and valuation of the Bonds either as loans or investments; and

l. failing to obtain an understanding of FSB's internal controls related to the Bonds.

78. Each of BKD's cited failures above violated applicable professional standards, including but not limited to:

- AU 150    Generally Accepted Auditing Standards.

- AU 161    The Relationship of Generally Accepted Auditing Standards to Quality Control Standards.

- AU 210    Training and Proficiency of the Independent Auditor.

- AU 230    Due Professional Care in the Performance of Work.

- AU311     Planning and Supervision.

- AU 312    Audit Risk and Materiality in Conducting an Audit.

- AU 314    Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement.

- AU 316    Consideration of Fraud in a Financial Statement Audit.

- AU 318    Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained.

- AU 325    Communicating Internal Control Related Matters Identified in an Audit.

- AU 326    Audit Evidence.

- AU 328    Auditing Fair Value Measurements and Disclosures.

- AU 329    Analytical Procedures.

- AU 330    The Confirmation Process.

- AU 333    Management Representations.

- AU 334    Related Parties.

- AU 336    Using the Work of a Specialist.

- AU 339    Audit Documentation.

- AU 342    Auditing Accounting Estimates.

- AU 350    Audit Sampling.

- AU 380    The Auditor's Communication With Those Charged With Governance.

- AU 410    Adherence to Generally Accepted Accounting Principles.

26

- AU 411    The Meaning of *Present Fairly in Conformity With Generally Accepted Accounting Principles*.

- AU 508    Reports on Audited Financial Statements.

- AU 560    Subsequent Events.

- AU 561    Subsequent Discovery of Facts Existing at the Date of the Auditor's Report.

- QC 10     Statements on Quality Control Standards, Section 10 – A Firm's System of Quality Control.

79.    As a whole, BKD's work violated governing professional standards in many significant ways, including but not limited to the above, and thus BKD missed several opportunities to discover Lewis's fraud.

80.    Had BKD complied with applicable professional standards, BKD would have detected Lewis's fraud well before it was ultimately uncovered.  Under professional standards, BKD would have been required to promptly advise FSB of the fraud, which would have prompted immediate action by FSB to cease acquiring Bonds, thus significantly reducing the losses that FSB sustained.  Specifically, the losses FSB sustained by acquiring additional fraudulent and worthless Bonds would have been stopped if BKD had performed its audit and related professional services in accordance with professional standards and reported the resulting findings to FSB.

81.    As a direct and proximate result of BKD's negligence, FSB sustained significant damages in an amount to be proven at trial.

### Count II
Gross Negligence

82.    The FDIC incorporates paragraphs 1-81 into this claim for relief.

83.     BKD carelessly and recklessly performed its duties in connection with the 2009 Audit to such a degree that its conduct demonstrated utter indifference to the consequences that could result, thereby constituting gross negligence.

84.     As a direct and proximate result of BKD's gross negligence, FSB sustained significant damages in an amount to be proven at trial.

### Count III
Breach of Contract

85.     The FDIC incorporates paragraphs 1-84 into this claim for relief.

86.     BKD contracted with FSB to provide FSB professional accounting and auditing services.  Among other things, BKD contractually agreed to conduct an audit "in accordance with auditing standards generally accepted in the United States of America."  BKD breached its contractual obligations to FSB, in several respects, including but not limited to failing to provide accounting and auditing services in accordance with professional standards, such as GAAP and GAAS.  Further, BKD breached the terms of its engagement agreement with FSB.

87.     FSB performed, or substantially performed, its material contractual obligations.

88.     BKD's breach of contract proximately caused significant damage to FSB in an amount to be proven at trial.

### PRAYER FOR RELIEF

For these reasons, the FDIC requests that the Court award the FDIC judgment against BKD for:

a.   actual damages in an amount to be proven at trial;

b.   prejudgment and post-judgment interest as allowed by law;

c.   costs of court;

d.   return of any and all fees that FSB paid to BKD for the negligent audit; and

28

e.  any other relief allowed by law and deemed appropriate by the Court.

### JURY DEMAND

Plaintiff demands a jury trial in this matter.

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR FIRST
SOUTHERN BANK

By: _____
      One of its attorneys

Stephen B. Niswanger
NISWANGER LAW FIRM, PLC
Centre Place Building
212 Center Street, 11th Floor
Little Rock, Arkansas  72201
(501) 773-3651 Telephone
(501) 421-3651 Facsimile
steve@niswangerlawfirm.com

Of counsel:

C. Philip Curley
Cynthia H. Hyndman
Robert L. Margolis
Elisa C. Wesche
ROBINSON CURLEY & CLAYTON, P.C.
300 South Wacker Drive, Suite 1700
Chicago, Illinois  60606
(312) 663-3100 Telephone
(312) 663-0303 Facsimile
pcurley@robinsoncurley.com
chyndman@robinsoncurley.com
rmargolis@robinsoncurley.com
ewesche@robinsoncurley.com

George R. Fair
Michael O. Gwin
WATKINS & EAGER PLLC
Emporium Building
400 East Capitol Street
Jackson, Mississippi 39205
(601) 965-1900 Telephone
(601) 965-1901 Facsimile
gfair@watkinseager.com
mgwin@watkinseager.com

(Of counsel will file motions for admission *pro hac vice*)